UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Raul G., | |
| Plaintiff, | 1:24-cv-08828 (SDA) |
| -against- | OPINION AND ORDER |
| Commissioner of Social Security, | |
| Defendant. | |

STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:

Plaintiff Raul G. ("Raul" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Now before the Court is Plaintiff's motion to remand this action to the Commissioner for further administrative proceedings. (Pl.'s Mot., ECF No. 14.) For the reasons set forth below, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

BACKGROUND

I.      Procedural Background

Raul filed an application for DIB on April 22, 2022, with an alleged onset date of March 22, 2022. (Administrative R., ECF No. 11 ("R."), 11, 213, 345.) The Social Security Administration ("SSA") initially denied his application on September 12, 2022, and again, following his request for reconsideration, on May 12, 2023. (R. 11.) On May 26, 2023, Raul filed a request for a hearing before an Administrative Law Judge ("ALJ"). (R. 11, 124.) A telephonic hearing was held on

January 23, 2024, before ALJ Mark Solomon. (R. 11, 193, 345.) Raul was represented at the hearing by his attorney, Christopher Latham, Esq. (R. 11.)

In a decision dated February 23, 2024, ALJ Solomon found Raul not disabled. (R. 10-22.) Thereafter, Raul requested review of the ALJ's decision from the Appeals Council. (*See* R. 1, 33, 43.) The Appeals Council denied the request on August 9, 2024, making ALJ Solomon's decision the Commissioner's final decision. (R. 1-6.) This action followed.

## II.    Non-Medical Evidence

Born on October 1, 1980, Raul was 41 years old on the alleged onset date and 43 years old at the time of the ALJ hearing. (*See* R. 25.) Raul has a high school education, plus three years of college, and past relevant work experience in the banking industry. (R. 48, 81, 308, 469.)

## III.    Medical Evidence Before the ALJ[1]

### A.    Treatment Prior To Alleged Onset Date

In November 2020, Raul sought mental health treatment from The Jewish Board to address worsening depression and anxiety. (R. 359.) Prior to his intake appointment, Raul experienced an esophageal perforation after choking on food.[2] (R. 359, 372.) On November 25, 2020, Raul underwent surgery for the at New York Presbyterian/Columbia University Irving Medical Center performed by Dr. Bryan P. Stanifer, M.D. (R. 948-50.) Following surgery, Raul experienced sepsis and he was hospitalized for approximately three weeks. (R. 449-52.) While hospitalized, Raul was seen for a psychiatric consultation, at his request, given prolonged

---

[1] The Court focuses on the medical evidence from on or after the alleged onset date of March 22, 2022 through February 23, 2024, the date of the ALJ's decision, relating to Plaintiff's mental impairments, since Plaintiff challenges only aspects of the ALJ's decision that relate to those impairments.

[2] Esophageal perforation occurs when a hole or break is formed in the esophagus. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") at 1389 (33d ed. 2020).

symptoms of anxiety and his recent missed appointment. (R. 450.) On December 2, 2020, Raul was given Zyprexa with mild effect but hallucinated with a 0.5 mg dose of Ativan. (*Id.*) The following day he was started on Lexapro and Haldol with good response. (*Id.*) On December 11, 2020, Raul was discharged home with a Blake drain[3] and enteral feeds via a jejunostomy tube ("J-tube").[4] (R. 450, 916.)

On December 16, 2020 Raul saw LMSW Ji-Ae Chang at the Jewish Board for an intake telehealth appointment. (R. 359, 366-70, 421.) Raul reported that his anxiety peaked during his hospitalization but that his anxiety and depression symptoms disappeared since starting Lexapro. (R. 359, 366-67.) LMSW Chang recommended individual psychotherapy, a psychiatric evaluation and further evaluation and management. (R. 364.)

On January 7, 2021, Raul saw Kimberly Colon, NP over Zoom for a psychiatric evaluation. (R. 403-10.) Raul reported an onset of anxiety in October 2020 due to the COVID-19 pandemic that had since worsened. (R. 408.) He reported that taking Lexapro at first created heightened anxiety, but he felt stable on the combination of Lexapro and Haldol. (*Id.*) NP Colon adjusted Raul's medications and scheduled a follow-up appointment for the following month. (*Id.*)

On February 4, 2021, Raul participated in a telephonic follow-up session with NP Colon. (R. 411-15.) Raul denied recent anxiety attacks but expressed concern about his anxiety and depression returning once he returned to work the following week. (R. 411, 413-14.) Raul

---

[3] A "Blake drain" is a device that "is used to remove unwanted fluids that build up in the body." Rutgers Cancer Institute of New Jersey Rutgers Health, *Jackson Pratt (or Blake) Drain Care*, https://perma.cc/9N69-R5PN.

[4] A "jejunostomy tube" is "a method of delivering feeds through jejunal access in the small bowel." Jason R. Cruz and Marco Casella, *Feeding Jejunostomy Tube*, National Library of Medicine (July 24, 2023), https://perma.cc/LP3G-RLKV.

reported taking Lexapro for three weeks and then self-discontinuing it due to worsening anxiety and restlessness and self-discontinuing Haldol due to excessive sedation. (R. 411.) NP Colon started Raul on a low dose of Risperdal to assess tolerability. (R. 412.) The following week, on February 11, 2021, Raul reported self-discontinuing Risperdal after experiencing inability to sleep and worsening restlessness. (R. 416.) Raul requested switching to Zoloft because his brother had a successful trial of Zoloft when he was younger. (*Id.*) NP Colon initiated a trial of Zoloft. (R. 418.)

Throughout February 2021, Raul also saw LMSW Anna Ginzburg approximately once per week for individual therapy sessions. (R. 371-75) Raul also continued to see Dr. Stanifer for follow-up visits relating to his surgery. (R. 916-17, 919-20.) By March 2021, his J-tube was removed and Dr. Stanifer noted that Raul was free to resume work and normal activity. (*Id.*) Raul also continued his weekly therapy sessions with LMSW Ginzburg. (R. 376-84.)  Raul saw LMSW Gunzburg twice more in April 2021, reporting significant improvement in his quality of life and satisfaction with his new job and new role. (R. 385-88; *see also* R. 423-28 (Treatment Plan).) However, during sessions in May and early June 2021, he reported an overwhelming amount of work leading to anxiety attacks. (R. 389-94.)

During a June 9, 2021 session with LMSW Ginzburg, Raul presented in a stable mood and reported a reduction in fatigue and anxiety and continued to report a reduction in anxiety later that month. (R. 395-98.) Raul did not show up for his scheduled session in July and, during his final session on August 10, 2021, reported improved quality of life, better relationships with family, satisfaction with job and new career plans. (R. 400-01.) LMSW Ginzburg noted that Raul would be discontinuing individual therapy. (R. 400.)

**B.      April 2022 Through September 2022**

On April 4, 2022, Raul saw Dr. Sixto Caro, M.D. for an initial primary care visit. (*See* R. 752-57.) Raul reported suffering from post-traumatic stress disorder and anxiety since his thoracic surgery in November 2020. (R. 752.) Raul explained that he had been seeing a psychiatrist but stopped abruptly due to side effects of the medication prescribed, and seeing a psychologist regarding his anxiety. (*Id.*) Raul further reported experiencing chronic fatigue with hypersomnia for the past year and that his symptoms were impacting his job. (*Id.*) Raul reported experiencing "brain fog" during a presentation in February/March 2022 and that he felt incompetent and lacked energy and concentration. (*Id.*) As a result, Raul took leave from his job beginning on March 22, 2022. (*Id.*)

Dr. Caro noted normal findings in his general examination. (R. 753.) Dr. Caro assessed chronic fatigue, palpitations, anxiety disorder, other long term drug therapy and body mass index between 26.0 and 26.9. (R. 753.) Dr. Caro ordered lab tests, referred Raul to sleep medicine and radiology, and provided counseling regarding diet and physical activity. (R. 753-57.) Dr. Caro also started Raul on Fluoxetine (Prozac) for anxiety. (R. 757.) Dr. Caro noted that Raul would follow up with his psychologist and had an upcoming appointment to see psychiatrist Dr. Elba Bello. (*Id.*)

On April 13, 2022, Raul saw psychiatrist Dr. Elba Bello, M.D. for a psychiatric diagnostic evaluation. (R. 631-35.) During the appointment, Raul described experiencing a significant change in his job performance the prior month and not having the energy to play or communicate with his daughters or wife. (R. 631.) Raul reported changing primary care providers and being

5

diagnosed with chronic fatigue syndrome. (*Id.*) At the time, he was taking Buproprion SR 100 mg,[5] which created insomnia when taken twice a day and he had stopped the afternoon dose. (*Id.*)

On mental status examination, Dr. Bello noted that Raul was sad and nervous with a dysphoric and anxious affect, but was appropriately dressed and groomed, alert and oriented, had a linear thought process, intact memory and fund of knowledge, and was focused with good insight and unimpaired judgment. (R. 633.) Dr. Bello diagnosed Raul with generalized anxiety disorder and major depression, single episode, moderate, and adjusted his prescription to 150 mg of Buproprion (Wellbutrin XL) once per day. (R. 634; *see also* R. 635.)

During a follow-up visit with Dr. Bello on April 20, 2022, Raul explained that he was experiencing fatigue, flu-like symptoms, lack of concentration and memory, verbal communication issues due to brain fog, anxiety and depression. (R. 635.) Raul reported insomnia and nausea from the Wellbutrin XL. (R. 636.) Raul thought the medication was keeping him up at night, but he was sleeping late and taking naps in the afternoon so although he still got tired, he felt more alert. (R. 635.) On mental status examination, Dr. Bello noted that Raul's mood was the same and he had a restricted affect, but otherwise normal findings. (R. 636.) Dr. Bello continued Raul on Wellbutrin XL and started him on Abilify 2mg every night at bedtime. (R. 637.) Dr. Bello also provided information about potential side effects, such as hypomania from Wellbutrin XL and sedation, increased weight and metabolic syndrome from Abilify. (R. 635.)

On April 26, 2022, Raul saw Dr. Bello for medication management. (R. 639.) Raul reported insomnia and nausea from Wellbutrin XL and Dr. Bello also noted headaches and possible

---

[5] "Bupropion is used to treat major depressive disorder (MDD) and to prevent seasonal affective disorder (SAD) . . .." Mayo Clinic, *Bupropion (oral route)*, https://perma.cc/GP56-3K98.

increase in blood pressure. (R. 640.) A mental status examination had normal findings with a better mood and full range of affect. (R. 640-41.) Dr. Bello discontinued Wellbutrin XL and continued Raul on Abilify at bedtime. (R. 641.)

In a follow up visit with Dr. Caro on April 29, 2022, Raul complained of dizziness and recurring headaches since his post-operative complication and anxiety/depressive symptoms. (R. 750.) Dr. Caro noted that Fluoxetine had caused dizziness as a side effect. (R. 750.) Dr. Caro noted nothing unusual from his general examination. (R. 750-51.) Dr. Caro started Raul on a potassium table for hypertension and instructed him to continue his medications for anxiety. (R. 751.) Raul also filled out a form for short term disability for four months due to functional impairments are work, including lack of energy and concentration, fatigue and sleep disturbance. (*Id.*) Dr. Caro referred Raul to a radiology center for an MRI of his brain due to his headache and dizziness symptoms. (*Id.*)

On May 10, 2022, Raul saw Dr. Bello for a follow-up visit for medication management. (R. 834-37.) Raul had contacted the office the week prior stating that he had been taking Abilify with "slight relief" but noted an increase in his blood pressure, and he was advised to stop taking the Abilify until his appointment. (R. 834.) Dr. Bello discontinued Abilify and started Raul on a trial of Duloxetine (Cymbalta).[6] 20 mg once per day with a plan to follow up in one to two weeks. (R. 837.) On May 15, 2022, Raul underwent an MRI of the brain, which yielded unremarkable findings. (R. 559-61.)

---

[6] "Duloxetine [which has the brand name Cymbalta] is used to treat depression and anxiety." *See* Mayo Clinic, *Duloxetine (oral route)*, Mayo Clinic, *Duloxetine (oral route)*, https://perma.cc/YWM3-WRFJ.

On May 18, 2022, Raul saw Dr. Bello for a follow-up appointment and reported improvement, stating that Cymbalta felt "different" and that he was not experiencing increased blood pressure and felt "calmer" and better able to "accomplish some of his tasks." (R. 838.). While he initially experienced panic attacks on Cymbalta, he reported that walking helped. (*Id.*) Raul reported a loss of appetite, but that he was getting more restful sleep, and his fatigue and brain fog symptoms had been better. (*Id.*) However, he expressed doubts that he would be able to return to work and feared his stress would get in the way, as there were many tasks. (*Id.*) Dr. Bello noted that Raul's diagnosis seemed to be chronic fatigue syndrome, though she would continue to consider bipolar disorder. (*Id.*) Dr. Bello continued Raul on the same regimen of Cymbalta with a plan to follow up again in one to two weeks. (R. 841.)

The same day, Raul saw neurologist Dr. Eduard H. Valdes Valderrama, M.D. at NYU Lutheran Medical Center. (R. 581.) Raul reported that his level of anxiety was improving after starting Cymbalta. (R. 582.) However, he described having two panic attacks in the prior week as well as disabling anxiety and fatigue. (R. 581.) Dr. Valderama noted that Raul had developed disabling anxiety, fatigue and panic attacks which had limited his ability to complete his activities of daily living and professional responsibilities. (R. 584.) Dr. Valderama assessed a differential diagnosis of chronic fatigue syndrome secondary to the stress associated with Raul's prolonged hospitalization for esophageal perforation in the setting of generalized anxiety disorder, which was complicated by a COVID-19 infection. (*Id.*) Dr. Valderama noted that Cymbalta provided mild subtle improvement and had not caused any significant side effects, though it was currently too early in his treatment course to determine the full extent of derived benefit or side effects that

8

he may experience from the medication. (*Id.*) Dr. Valderama recommended that Raul continue care with his psychiatrist and psychologist and return to the neurology clinic as needed. (*Id.*)

Raul saw Dr. Caro for a follow-up visit on May 25, 2022. (R. 746-49.) Raul continued to complain of fatigue-related symptoms and stress induced by mental activity. (R. 746.) Dr. Caro's general examination of Raul yielded nothing unusual. (R. 746-47.) Dr. Caro referred Raul to Physical Medicine & Rehabilitation for physical therapy with acupuncture at least twice per week with a plan to follow up in four weeks. (R. 747-48.)

On June 7, 2022, Raul saw Dr. Bello for medication management and follow up regarding depressive and anxious symptoms. (R. 842-45.) Raul reported experiencing more brain fog, especially after feeling frustrated about his application for disability. (R. 842.) He reported trying to do the Gupta Program[7] for chronic fatigue. (*Id.*) Raul also reported that his mornings seemed to be better, but he still struggled in the afternoons due to his mood and anxiety. (*Id.*) Dr. Bello increased Raul's dose of Cymbalta to 40 mg. (R. 844.)

Around this time, Raul had a virtual consultation with Dr. Benjamin Yudkoff, M.D. a psychiatrist at Brigham and Women's Faulkner Hospital in Boston.[8] (R. 880-881, 890.) Dr. Yudkoff opined that chronic fatigue syndrome was an appropriate diagnosis based upon his review of Raul's medical records. (R. 887.) Dr. Yudkoff made several recommendations, including additional

---

[7] The Gupta Program is a commercially available "brain re-training" program. *See* Gupta Program website, https://perma.cc/WKU8-2TCH.

[8] The record is unclear as to the precise date that this consultation occurred. Although the index to the exhibits contained in the Administrative Record reflects a date of March 13, 2023 (*see* ECF No. 11 at PDF p. 4), the ALJ stated that Dr. Yudkoff's report "appears to have been completed by early June 2022" (R. 18), which is supported by Dr. Caro's June 15, 2022 note referring to a consultation with a specialized doctor. (R. 743.)

testing, considering increasing Raul's Cymbalta dose and/or starting Ritalin, cognitive behavioral therapy and healthy living practices. (R. 888-89.)

On June 15, 2022, Raul had a follow-up visit with Dr. Caro in which he reported that he continued to feel impaired in his functional daily activities and had experienced recent episodes of anxiety and brain fog. (R. 743.) Dr. Caro noted a plan for Raul to follow up with Dr. Bello to see how the increased dose of Cymbalta was working. (R. 744.) Dr. Caro counseled Raul regarding his chronic fatigue syndrome diagnosis, noting that treatment only would take care of other symptoms, such an anxiety and depression, that exacerbate the chronic fatigue. (*Id.*) Dr. Caro suggested Raul have an exercise routine and to use techniques of sleep education. (*Id.*) Dr. Caro noted that Raul would require disability because of the impairment functionality in daily activities. (*Id.*)

On July 7, 2022, Dr. Bello noted that Raul's increase in Cymbalta initially had caused an increase in anxiety attacks, but that it improved after about one week. (R. 846.) Raul still had panic attacks when sleeping, which seemed to be triggered by added stress. (*Id.*) However, the Cymbalta had decreased some of his chronic fatigue symptoms. (*Id.*) Dr. Bello increased Cymbalta to 60mg with a plan to follow up in two weeks. (R. 848.)

Raul saw Dr. Caro again on July 11, 2022 complaining of palpitations, fatigue, tiredness, anxiety and PTSD. (R. 914.) Dr. Caro added an assessment of panic disorder and prescribed Xanax because Raul had suffered panic attacks more frequently (3 times per day lasting one hour) on the higher dose of Cymbalta.[9] (R. 915; *see also* R. 739 (explaining July 2022 symptoms).)  On July

---

[9] "Alprazolam [one of the brand names of which is Xanax] is used to relieve symptoms of anxiety, including anxiety caused by depression. It is also used to treat panic disorder in some patients. Alprazolam is a benzodiazepine. Benzodiazepines belong to the group of medicines called central nervous system (CNS)

22, 2022, Dr. Caro completed a provider statement in connection with Raul's disability leave. (R. 758-63.) Dr. Caro opined that Raul could not return to work because he continued to experience persistent symptoms related to chronic fatigue syndrome, exacerbated by anxiety and depression, despite medication. (R. 760.) Dr. Caro noted that Raul experienced loss of appetite and insomnia from increased dosage of Cymbalta; panic attacks and socialization problems. (R. 762.) Dr. Caro further noted that Raul had experienced recurrent panic attacks from the increased dosage of Cymbalta so Dr. Bello had lowered the dose which ceased the panic attacks, but not entirely, and Raul was scheduled for further follow-up. (R. 763.)

On August 3, 2022, Raul had a follow-up appointment with Dr. Bello. (R. 850-54.) Raul had a panic attack during the session, which seemed to improve as he was able to vent about the frustration he felt from not feeling capable of work. (R. 850.) Raul reported that his panic attacks had been occurring more often. (*Id.*) Raul reported that if he did not take Cymbalta his brain fog kicked in and that the medication allowed him to do some things but not function as he used to. (R. 850.) Raul felt that the higher dose of medication had been worsening his anxiety and felt more stable on lower dose. (*Id.*) Dr. Bello decreased Raul's Cymbalta dose to 40 mg, with a plan to continue to titrate the medication if his symptoms did not improve. (R. 853.)

In a visit with Dr. Caro on August 17, 2022, Raul reported that his symptoms of chronic fatigue, forgetfulness, lack of concentration, anxiety and depression persisted. (R. 739.) Raul continued to have symptoms but had not had further panic attacks since Dr. Bello reduced his

---

depressants, which are medicines that slow down the nervous system." Mayo Clinic, *Alprazolam (oral route)*, https://perma.cc/5F9Q-XW8M.

Cymbalta dosage back to 40 mg. (*Id.*) Dr. Caro continued Raul's Xanax prescription and noted that Raul should continue to see Dr. Bello for follow-ups and suggested psychotherapy. (R. 741.)

On September 21, 2022, Raul saw Dr. Bello for a follow-up appointment. (R. 854-57.) Raul reported trying to do more activity, which brought back his fatigue. (R. 854.) He also reported having more panic attacks largely from financial uncertainty. (*Id.*) Dr. Bello discussed increasing his dosage of Cymbalta again and, if there were no side effects, considering a trial of low dose stimulant to help with brain fog. (*Id.*) Dr. Bello increased Cymbalta to 60 mg. (R. 857.)

C.     **September 8, 2022 State Agency Consultant Assessment**

In an initial disability determination explanation, signed on September 8, 2022, the state agency psychological consultant, Dr. C. Walker, Ph.D. opined that Raul had mild limitations in his ability to understand, remember, or apply information and interact with others, and moderate limitations in his ability to concentrate, persist, or maintain pace and adapt or manage oneself. (R. 73.) Walker also found that Raul was moderately limited in his ability to maintain attention and concentration for extended periods, as well as his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms at a consistent pace without taking an unreasonable number and length of rest periods. (R. 77-81.)

D.     **March 16, 2023 Psychiatric Consultative Examination – Dr. Lana Krichmar-Liverant, Ph.D.**

On March 16, 2023, Raul saw psychologist Dr. Krichmar-Liverant for a psychiatric consultative examination. (R. 350-53.) Dr. Krichmar-Liverant noted that Raul was taking 30 mg of Cymbalta daily. (R. 350.) Raul reported difficulty falling sleeping due to nightmares, loss of appetite, depressive symptoms secondary to flare-ups of his chronic fatigue syndrome, which happened once or twice per week, brain fog and confusion. (*Id.*) Raul further reported that, when

his symptoms became unbearable, he became nonfunctional and could not do anything. Raul also reported that medication helped to alleviate his depression. (*Id.*) With respect to anxiety-related symptoms he endorsed excessive apprehension and worrying. (*Id.*) He reported that his anxiety was triggered by chronic fatigue syndrome flare-ups. (*Id.*) Raul also reported that medication helps with panic attack symptoms and that panic attacks happen every day and can last up to thirty minutes. (*Id.*)

On mental status examination, Dr. Krichmar-Liverant found that Raul was dressed appropriately and well-groomed. (R. 350.) His speech was fluent and clear; expressive and receptive language were adequate; his thought process was coherent and goal directed; he had a full range of affect; his mood was anxious; his attention and concentration were intact; his recent and remote memory skills were moderately impaired; his intellectual functioning was estimated to be average and his insight and judgment were good. (R. 350-51.)

Dr. Krichmar-Liverant noted that Raul was able to do all activities of daily living independently, but that he does not dress, bathe or groom himself during flare-ups. (R. 351.) Raul did laundry and drove his wife to the store but did not cook or make meals. (*Id.*) He tended to forget things. (*Id.*) He engaged in minimal socializations. His activities included watching television, using a computer, playing dominoes and using his phone. (R. 352.)

Dr. Krichmar-Liverant found that there was no evidence of limitations in Raul's ability to understand, remember or apply simple directions or instructions, interact adequately with supervisors, coworkers, and the public and be aware of normal hazards; mild limitations in his ability to understand, remember or apply complex directions and instructions and maintain personal hygiene and appropriate attire; and mild to moderate limitations in his ability to use

13

reason and judgment, make work-related decisions, sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior and maintain wellbeing. (R. 352.)  Dr. Krichmar-Liverant determined that these difficulties were caused by fatigue or distractibility. (*Id.*) Dr. Krichmar-Liverant concluded that the results of the examination appeared to be consistent with psychological problems but did not appear to be significant enough to interfere with Raul's ability to function on a daily basis. (*Id.*)

Dr. Krichmar-Liverant diagnosed adjustment disorder with depressed mood and anxiety and recommended that Raul continue with psychiatric treatment as currently provided, individual psychotherapy and vocational assessment and training. (R. 352.) Dr. Krichmar-Liverant noted the expected duration of Raul's impairments and time frame for suggested therapy was more than two years and indicated Raul's prognosis was guarded, given he follows the recommendations. (R. 353.)

E.    **April 6, 2023 Internal Medicine Consultative Examination – Dr. Silvia Aguiar, M.D.**

On April 6, 2023, Raul saw internist Dr. Aguiar for an internal medicine consultative examination. (R. 355-58.) Raul complained of fatigue, trouble concentrating, brain fog, anxiety, depression and forgetfulness, and noted his prior history of issues related to his esophagus. (R. 355.) Raul reported that his wife performed all activities of daily living. (R. 356.) Upon physical examination, Dr. Aguiar found that Raul appeared to be in no acute distress with normal findings, including good cooperation and effort, no sensory deficit, 5/5 strength in the upper and lower extremities and 5/5 grip strength bilaterally. (R. 356-7.) Dr. Aguiar noted that Raul's prognosis was guarded. (R. 357.) Dr. Aguiar opined that, based on his examination, Raul did not have any functional limitations and deferred any psychological findings to the psychologist (R. 358.)

14

**F.      May 9, 2023 State Agency Reconsideration Assessment**

In a disability determination explanation at the reconsideration level, dated May 9, 2023, state agency psychiatric consultant, C. Anderson, M.D. opined that, despite some psychiatric limitations, Raul would be able to understand, remember and follow simple and detailed instructions and procedures; maintain sufficient concentration, focus, and pace in a typical work situation; interact appropriately with co-workers, supervisors, and the public; and respond appropriately to routine changes and cope with normal stressors in a typical work situation, but would benefit from a low stress work environment. (R. 94.)

**G.      July 2023 Through November 2023 Treatment Records**

On July 17, 2023, Raul saw Dr. Caro for a follow-up visit.[10] (R. 908-10.) Raul complained of chronic fatigue, brain fog and depression. (R. 908.) A PHQ-9 screening indicated moderately severe depression. (R. 908.) Dr. Caro noted normal findings in his general examination. (R. 909.) Dr. Caro reviewed a proposed treatment plan and goals with Raul and noted that he needed to continue to see Dr. Bello for follow-ups. (*Id.*) Dr. Caro referred Raul to psychiatry for evaluation and treatment. (R. 909-10.) Raul saw Dr. Caro again on September 8, 2023 for a refill of his Xanax prescription. (R. 906-07.)

On November 15, 2023, Raul had a telephone appointment with Dr. Caro for evaluation and management. (R. 905.) Dr. Caro noted Raul's chief complaint as anxiety. (*Id.*) Dr. Caro continued Raul's prescription for Cymbalta 20 mg and refilled his prescription for Xanax. (*Id.*)

---

[10] There are no records of treatment between Raul's September 21, 2022 visit with Dr. Bello and his July 17, 2023 visit with Dr. Caro.

**H.        January 29, 2024 – Dr. Caro Physical Capacity Evaluation And Assessment Of Ability To Do Mental Work-Related Activities**[11]

On January 29, 2024, Dr. Caro completed a Physical Capacity Evaluation of Raul as well as a Medical Assessment of his ability to perform mental work-related activities. (R. 964-69.)

Dr. Caro indicated that Raul was taking Alprazolam (Xanax) as needed, which caused drowsiness; Duloxetine (Cymbalta) 20 mg once per day, which cause increase in blood pressure as well as potassium and hydrochlorothiazide. (R. 964.) Dr. Caro opined that Raul could constantly lift and carry zero to five pounds but never greater than five pounds and that, due to his chronic fatigue syndrome, Raul could not stand for more than one hour or sit for more than three hours during an eight-hour workday. (R. 964-65.) Dr. Caro further opined that, due to post-thoracotomy pain, Raul could never engage in climbing, bending, stooping, kneeling, crouching, crawling, pushing or pulling, and could engage only occasionally in bending, reaching and fingering/handling/feeling. (R. 966.) Dr. Caro also opined that Raul had environmental limitations in each of the listed areas, and noted objective signs of sensory loss, reflex loss, musical spasms, muscle weakness and impaired sleep. (R. 967.)

 In his medical assessment of Raul's ability to perform metal work-related activities, Dr. Caro opined that Raul's ability to perform tasks related to making occupations adjustments, including relating to co-workers, interacting with supervisors, dealing with the public, using judgment, dealing with stress and maintaining attention and concentration was "poor or none" indicating that he had no useful ability to function. (R. 968.) Dr. Caro noted Raul's work-related tasks were significantly hindered by triggers related to both physical and mental activity. (*Id.*)

---

[11] This evaluation was completed and submitted after the hearing before the ALJ, which occurred on January 23, 2024. (*See* R. 44, 47-48.)

Similarly, in tasks related to making performance adjustments, such as understanding, remembering and carrying out even simple job instructions, Dr. Caro opined that Raul's ability was poor or none. (R. 969.) Dr. Caro noted that these limitations stemmed from triggers that exacerbated symptoms of chronic fatigue syndrome, major depression and anxiety. (*Id.*) Dr. Caro further opined that Raul's ability to maintain his personal appearance was fair, but other abilities relating to making personal social adjustments were poor or none for the same reasons. (*Id.*) Dr. Caro opined that Raul was incapable of sustaining full time employment in any capacity. (*Id.*)

## IV.    The January 23, 2024 Administrative Hearing

### A.    Plaintiff's Testimony

During the January 23, 2024 administrative hearing, Raul testified that he had anxiety, which caused him to have an increased heart rate, especially in social settings. (R. 50.) Raul also described experiencing extreme fatigue, explaining that when he was employed, he would come in at 9:00 a.m. and be completely exhausted by 11:00 a.m. (*Id.*) Raul testified that he had brain fog and short-term memory loss, as well as difficulty recalling words, which caused him more anxiety. (*Id.*) Raul further testified that he would have "outbreaks" that would be noticeable to others and experienced "restless sleep" causing him to wake up exhausted and sometimes very late. (R. 50-51.) He also reported that he had panic attacks while in social settings, during which his heart rate increased, his breathing sped up and he had shortness of breath. (R. 55.) Raul testified that the panic attacks lasted a long time and were repetitive, and that he felt weak and had trouble concentrating. (*Id.*) Raul testified that he could not be around other people when having panic attacks, so he had to lock himself in his bedroom and take his medication. (*Id.*) Raul

17

also testified that he no longer drove because driving would trigger brain fog, which would start a "flare-up" of his symptoms that could cause him to stay in bed for a week. (*Id.*)

Raul testified that when he had a flare-up, he became bedridden and was unable to bathe himself. (R. 52.) However, Raul testified that he otherwise was able to shower and get dressed. (*Id.*) Raul testified that he had flare-ups constantly—three times or more in a month—and that the flare-ups were triggered by mental and physical activities. (*Id.*) Raul also testified that he was taking medication for anxiety and that the medication made him drowsy to the point that he mostly was in bed when on the medication. (R. 53.)

Raul testified that he was unable to take the train because he had panic attacks. (R. 54.) Raul stated that he was unable to take the bus and had to take cabs to all his appointments. (R. 56.) Raul testified that his wife did pretty much everything around their home, including taking care of their children. (R. 58.) Raul stated that he was unable to leave his home to go shopping or to the park because it caused anxiety and panic attacks. (R. 59.)

With respect to his physical limitations, Raul testified that he suffered from shortness of breath, allowing him to walk only two blocks before he had to catch his breath and rest. (R. 56.) Raul stated that he only was able to stand for fifteen minutes or so before he started feeling fatigued. (*Id.*) Raul further stated that he only was able to sit for half an hour before having spasms related to his thoracic surgery. (R. 56-57.) Raul testified that he only was able to lift up to five pounds. (R. 57.)

### B.    Vocational Expert Testimony

Vocational expert Christina Boardman ("VE Boardman") also testified at the hearing. (R. 62-65.) VE Boardman testified that, based upon Raul's limitations, he could not perform any past

relevant work. (R. 62.) The ALJ asked VE Boardman to assume a hypothetical individual with the same age, education and past work experience as Raul, who was limited to medium work, inclusive of sedentary work and light work, who could remember, understand and carry out simple instructions, use judgment to make simple work-related decisions, and who could adapt to routine and occasional changes in the workplace and perform a job with occasional contact with supervisors and co-workers and none with the public. (R. 63.) VE Boardman testified that, based upon those limitations, there were other jobs in the national economy that such individual could perform, including cleaner (Dictionary of Occupational Titles ("DOT") Code 323.687-010), kitchen helper (DOT Code 318.687-010), marker (DOT Code 209.587-034), routing clerk (DOT Code 222.687-022) and document preparer (DOT code 249.587-018). (R. 63-64.) VE Boardman also testified that a person with the additional limitation of being unable to adapt to routine or occasional changes in the workplace or walk, sit or stand for at least eight hours in an eight-hour workday, would be unable to perform any job. (R. 64.)

VE Boardman further testified that based upon her education, expertise, training and observation, an individual could be off task outside of regularly scheduled breaks up to fifteen percent throughout the day. (R. 64-65.) VE Boardman also testified that an individual could only miss one day of work per month before they would be deemed unable to work. (*Id.*)

**V.     The ALJ's Decision**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards, at step one, the ALJ found that Raul had not engaged in substantial gainful activity since the alleged onset date of March 22, 2022. (R. 13.) At step two, the ALJ found that Raul had severe impairments of chronic fatigue syndrome, depression and anxiety. (R. 14.) However, the ALJ

noted that the record appeared to be devoid of evidence supporting Raul's subjective complaints about the severity of his chronic fatigue syndrome, but in light of the "de minimis" standard, found sufficient evidence to support the finding that it was a severe impairment. (*Id.*)

At step three, the ALJ found that Raul's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). The ALJ considered the "paragraph B" criteria[12] and found that Raul had a mild limitation in understanding, remembering or applying information and moderate limitations in his ability to interact with others, concentrate, persist or maintain pace and adapt or manage oneself. (R. 15.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (R. 16.) The ALJ also considered whether the "paragraph C"[13] criteria were satisfied but found that the evidence failed to establish the presence of those criteria. (*Id.*)

Prior to proceeding to step four, the ALJ found that Raul retained the Residual Functional Capacity ("RFC") to perform medium work, as defined in 20 C.F.R. § 404.1567(c), inclusive of light and sedentary work, except that he could remember, understand and carry out simple

---

[12] The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." 20 C.F.R. § 404, Subpt. P, App'x 1. They are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id*. To satisfy the paragraph B criteria, a claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*.

[13] Paragraph C of Listings 12.04 and 12.06, among others, provides the criteria used to evaluate "serious and persistent mental disorders." 20 C.F.R. § 404, Subpt. P, App'x 1. To satisfy the paragraph C criteria, there must be "a medically documented history of the existence of the claimant's mental disorder over a period of at least two years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder," and "(2) marginal adjustment," *i.e.*, "minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [the claimant's] daily life." *Id*.

instructions; could use judgment to make simple work-related decisions; could adapt to routine and occasional changes in the workplace; and could have occasional contact with supervisors and coworkers and none with the general public. (R. 16.)

At step four, the ALJ found that Raul could not perform his past relevant work as a financial sales representative. (R. 25.) At step five, the ALJ considered Raul's age, education, work experience and RFC and concluded, based on VE Boardman's testimony, that there were jobs existing in significant numbers in the national economy that Raul could perform, including cleaner, kitchen helper, marker and routing clerk. (R. 26.) Therefore, the ALJ found that Raul was not under a disability at any time between March 22, 2022 and February 23, 2024, the date of the ALJ's decision. (R. 27.)

## LEGAL STANDARDS

### I.    Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the

21

record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See id.* at 51-52.

### III.    Regulations Regarding Consideration Of Medical Opinions And Prior Findings

Under the regulations applicable to applications filed on or after March 27, 2017, which apply to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR § 404.1520c(c). Using these factors, the most important of which are

24

supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

## DISCUSSION

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ (1) failed to consider the side-effects of Raul's medications; and (2) failed to include Dr. Krichmar-Liverant's limitations in his RFC assessment. (Pl.'s Mem., ECF No. 15, at 15.) Plaintiff further argues that that ALJ erred in his assessment of Raul's symptom intensity. (*Id.* at 17.) The Court considers each of these arguments, in turn.

### I.    Consideration Of Side Effects Of Medication

Plaintiff first contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to consider the side effects of his medications. (Pl.'s Mem. at 15-16.) Plaintiff points to his testimony that he experienced drowsiness after taking his anxiety medication and that after taking Alprazolam (Xanax) for panic attacks he would fall asleep within five to ten minutes. (R. 55.) Plaintiff faults the ALJ for not including any limitation for drowsiness in his RFC and for failing to "provide any valid explanation as to why [Plaintiff's] medications have no impact on work in the RFC." (Pl.'s Mem. at 16.) The Commissioner responds that no evidence supports the view that Plaintiff had any side effects from his medication that were more limiting than accounted for in the RFC finding. (Comm'r Br., ECF No. 17, at 12-15.)

"A claimant's subjective complaints are 'an important element in the adjudication of Social Security claims, and must be thoroughly considered in calculating the RFC of a claimant.'" *Castillo v. O'Malley*, No. 24-41-CV, 2024 WL 4707253, at *3 (2d Cir. Nov. 7, 2024) (quoting

*Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010)). "At the same time, an ALJ is 'not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" *Id.* (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

In considering a claimant's statements about the intensity, persistence, and limiting effects of his symptoms, an ALJ considers relevant factors, including the "type, dosage, effectiveness, and side effects of any medication an individual [is prescribed]." *See* Social Security Ruling 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). Nevertheless, "[w]here the record permits the court to glean the rationale of an ALJ's decision," the ALJ is not required to mention "every item of testimony presented to him." *Pound v. Comm'r of Soc. Sec.,* No. 17-CV-06331 (PGG) (SN), 2019 WL 2453339, at *4 (S.D.N.Y. Feb. 12, 2019), *report and recommendation adopted,* 2019 WL 1434623 (S.D.N.Y. Mar. 31, 2019) (citing *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. Mar. 8, 2011) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983))); *see also Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 767 (S.D.N.Y. 2018) ("An ALJ need not . . . explicitly address each and every statement made in the record that might implicate her evaluation of a claimant's credibility as long as 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision.'") (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013)).

Here, the ALJ considered Plaintiff's testimony and found that his statements regarding the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 17.) Although the ALJ did not specifically address Plaintiff's testimony regarding drowsiness from medication, the Court can

glean that the ALJ considered Plaintiff's testimony on this issue and found it unsupported by the record. *See Martes*, 344 F. Supp. 3d at 767 (gleaning ALJ's rationale regarding side effects from statements that record did not support allegations).

Plaintiff does not identify any evidence to support his testimony that the ALJ overlooked; nor does he explain how his alleged drowsiness should have been accounted for in the RFC determination. (*See* Pl.'s Mem. at 15-16; *see also* Comm'r Br. at 13.) The only mention in the record of drowsiness related to Xanax is from Dr. Caro's January 29, 2024 Physical Capacity Evaluation (R. 964), which the ALJ found to be inconsistent with and unsupported by his treatment records. (R. 24.) The record indicates that Raul took Xanax to address panic attacks, but none of Dr. Caro's treatment notes mention that Raul complained of or experienced drowsiness as a side effect. (*See* R. 739, 741, 905-06, 909, 914-15.) In April 2022, Dr. Bello noted sedation as a possible side effect from Abilify, but there is no evidence that Raul experienced this as a side effect. Notably, Raul took Abilify at bedtime and only for a few weeks before he stopped taking it due to increased blood pressure. (R. 635, 640, 837.) Because the record does not contain any evidence to corroborate Plaintiff's testimony regarding drowsiness, the Court finds that the ALJ did not err in omitting discussion of Plaintiff's subjective complaints regarding drowsiness or in failing to include any limitation related to drowsiness in the RFC determination. *See Wetzel v. Berryhill*, 783 F. App'x 44, 47 (2d Cir. 2019) (no error in failing to consider medication side effects when no evidence plaintiff complained to treating doctors that medications made him "very dopey" as he claimed during disability hearing); *Pound*, 2019 WL 2453339, at *5 (ALJ did not err in not expressly discussing impact of alleged side effect of drowsiness when not corroborated by record); *Martes*, 344 F. Supp. 3d at 767 (ALJ's failure to expressly address alleged side effects not

ground for remand when record contained no corroborating information for such side effects) (citing cases)); *Hilton v. Kijakazi*, 602 F. Supp. 3d 558, 575 (S.D.N.Y. 2022) (no error in ALJ's failure to discuss medication side effects when no supporting medical evidence that plaintiff experienced side effects).

As for Plaintiff's assertion that the ALJ should have explained why his medications have no impact on work in the RFC, Plaintiff does not identify any other alleged side effects that the ALJ should have considered, or how any of his medications impacted his ability to work. (Pl.'s Mem. at 16.) At times, Raul reported other side effects from medication, such as insomnia and nausea from Wellbutrin XL and dizziness from Fluoxetine, but Raul's treating doctors discontinued those medications. (R. 640-41, 750.) The record also documents that Raul experienced panic attacks when taking Cymbalta for the first time in May 2022 and upon increasing his dosage on two occasions in July 2022.[14] (R. 739, 838, 846, 850-53, 915). The ALJ discussed Raul's Cymbalta regimen, including his report that higher doses had been worsening his anxiety and that he felt more stable on a lower dose, and noted that Dr. Bello further adjusted his medication regimen. (R. 21.) The Court can glean from this discussion, coupled with the ALJ's thorough discussion of other objective medical evidence, that the ALJ reasonably determined that any side effects, which were short lived and addressed through changing the dosage of the medication, did not require a more restrictive RFC. Plaintiff does not identify any evidence to call into question the ALJ's findings. *See Smith v. Berryhill*, No. 18-CV-00759 (HKS), 2020 WL 1163856, at *6 (W.D.N.Y. Mar. 11, 2020) (ALJ properly considered side effects where ALJ discussed two

---

[14] The record indicates that Plaintiff also suffered panic attacks for reasons unrelated to Cymbalta, such as due to stress or financial uncertainty. (*See, e.g.*, R. 846, 854.)

medications and plaintiff failed to identify how occasional use of third medication was relevant to ALJ's assessment). Accordingly, the Court finds that the ALJ adequately considered the side effects of Plaintiff's medications.

**II.      Consideration Of Dr. Krichmar-Liverant's Opinion**

Plaintiff next argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to include the limitations assessed by Dr. Krichmar-Liverant and/or impermissibly cherry-picked from the opinion. (Pl.'s Mem. 16-17.) Plaintiff's argument is flawed because Dr. Krichmar-Liverant's determination that Raul had "up to moderate limitations" in certain areas, such as his ability to sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior, and maintain well-being does not compel the conclusion that Raul would be off-task more than 15% of the workday and/or absent from work more than one day per month, as Plaintiff suggests. (Pl.'s Mem. at 17.)

As the Commissioner argues, moderate limitations generally are consistent with the ability to perform unskilled work. (*See* Comm'r Br. at 16.) Thus, the Second Circuit frequently has rejected arguments that an ALJ's RFC determination must include restrictions regarding attendance or off-task percentage to account for moderate limitations in, *inter alia*, concentration and the ability to sustain regular attendance. *See Zabala,* 595 F.3d at 410-11; *Castillo*, 2024 WL 4707253, at *2 (citing *Rushford v. Kijakazi*, No. 23-317, 2023 WL 8946622, at *2 (2d Cir. Dec. 28, 2023) (noting that it is "well-established that . . . moderate limitations do not prevent individuals from performing 'unskilled work'"); *Valdes-Ocasio v. Kijakazi*, No. 21-3152, 2023 WL 3573761, at *1 (2d Cir. May 22, 2023) (concluding that an ALJ's RFC assessment appropriately accounted for moderate limitations even without including restrictions related to

staying on task or attendance)); *Parent v. O'Malley*, No. 23-917, 2024 WL 3342463, at *2 n.2 (2d Cir. July 9, 2024) (ALJ adequately accounted for moderate mental limitations in limiting plaintiff to unskilled, low stress work). Accordingly, the Court finds no merit to Plaintiff's argument that Dr. Krichmar-Liverant's opinion compelled a more restrictive RFC.

Moreover, in finding the opinion "substantially persuasive" the ALJ did not cherry pick portions of the opinion unfavorable to a finding of disability. An "ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). In limiting Raul to low contact and unskilled work, the ALJ gave some credit to his complaints of brain fog and imposed greater limitations than were called for by Dr. Krichmar-Liverant's opinion, which assessed, for example, no limitations in Raul's ability to interact with others. (R. 22-23.) For these reasons, the Court finds that the ALJ adequately considered Dr. Krichmar-Liverant's opinion.

### III.    Assessment Of Symptom Intensity

Finally, Plaintiff contends that the ALJ erred in the assessment of Raul's symptom intensity by ignoring or mischaracterizing evidence in support of Raul's testimony. (Pl.'s Mem. at 17-19.)

In evaluating a claimant's symptom intensity, an ALJ "must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record." *Kearney v. Berryhill*, No. 16-CV-00652 (MAT), 2018 WL 5776422, at *6 (W.D.N.Y. Nov. 2, 2018) (quoting *Vered v. Colvin*, No. 14-CV-04590 (KAM), 2017 WL 639245, at *15 (E.D.N.Y. Feb. 16, 2017) (citing SSR 16-3P, 2016 WL

1119029, at *4-6)). As set forth above, "an ALJ is 'not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" *Castillo,* 2024 WL 4707253, at *3 (quoting *Genier,* 606 F.3d at 49); *see also Watson v. Berryhill*, 732 F. App'x 48, 52 (2d Cir. 2018) (citing *Aponte v. Sec'y, Dep't of HHS*, 728 F.2d 588, 591 (2d Cir. 1984)) ("We defer to an ALJ's decision to discredit subjective complaints if the decision is supported by substantial evidence.").

The Court agrees with the Commissioner that Plaintiff's argument boils down to a disagreement with the ALJ's view of his subjective complaints, but that he has not demonstrated that a reasonable factfinder would have to assess greater limitations. (*See* Comm'r Br. at 16-17.) Plaintiff appears to take issue with the ALJ's reliance on the March 2023 consultative examination report of his activities of daily living, to the extent they were inconsistent with the April 2023 consultative report and/or his later hearing testimony. (Pl.'s Mem. at 18-19.) However, the ALJ was entitled to weigh the conflicting evidence to reach an RFC determination that was consistent with the record as a whole. *See Gentile v. Dudek*, No. 24-1467, 2025 WL 1324058, at *2 (2d Cir. May 7, 2025) (court must defer to Commissioner's resolution of conflicting evidence) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)); *see also Joel F. v. Comm'r of Soc. Sec.*, No. 20-CV-00904 (GTS) (DEP), 2021 WL 6503576, at *6 (N.D.N.Y. Nov. 9, 2021) ("The fact that the record contains statements in which plaintiff asserts greater limitations in his activities of daily living does not mean that the ALJ erred in relying on reports of activities of daily living that suggest lesser limitation . . . [since] it is the ALJ's responsibility to weigh such competing evidence and determine which evidence is most consistent with the record as a whole."), *report and recommendation adopted*, 2022 WL 160304 (N.D.N.Y. Jan. 18, 2022).

Moreover, in rejecting Plaintiff's testimony, the ALJ relied not only upon evidence regarding his activities of daily living, but on all the objective medical evidence since the alleged onset date, which the ALJ found consistently showed rather modest clinical findings and did not support the degree of reduced functioning alleged by Plaintiff. (R. 17-25.) Accordingly, the Court finds that the ALJ did not err in the assessment of Plaintiff's symptom intensity.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's motion (ECF No. 14) is DENIED and the decision of the Commissioner is AFFIRMED. The Clerk of Court is respectfully requested to close this case.

Dated:    New York, New York
          February 13, 2026

_____
STEWART D. AARON
United States Magistrate Judge